Donald E. J. Kilmer, Jr. [SBN: 179986]
Email: don@dklawoffice.com
Jessica L. Danielski [SBN: 308940]
Email: jessica@dklawoffice.com
LAW OFFICES OF DONALD KILMER, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Voice:  (408) 264-8489

Jason Davis [SBN: 224250]
Email: jason@calgunlawyers.com
THE DAVIS LAW FIRM
42690 Rio Nedo, Suite F
Temecula, California 92590
Voice: (949) 436-4867
Fax:   (888) 624-4867

Attorneys for Plaintiffs
JANE ROE #1, et al.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROE #1; JOHN DOE #1; JOHN DOE #2; JOHN DOE #3; JOHN DOE #4; JOHN DOE #5; SECOND AMENDMENT FOUNDATION, INC.,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF JUSTICE; FEDERAL BUREAU OF INVESTIGATION; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; MERRICK GARLAND (U.S. Attorney General), | Case No.: 1:19-CV-270-DAD-BAM<br><br>NOTICE OF SUPPLEMENTAL AUTHORITY<br><br>PENDING MOTION:<br>Date:    AUG 17 2021<br>Time:   9:30 a.m.<br>Judge:   Hon. Dale A. Drozd<br>Courtroom: 5, Seventh Floor |

Donald Kilmer
Attorney at Law
14085 Silver Ridge
Road.
Caldwell, ID 83607
Vc: 408/264-8489
don@dklawoffice.
com

1

NOTICE OF SUPPLEMENTAL AUTHORITY                    *Jane Roe #1, et al., v. United States, et al.*

1  CHRISTOPHER A. WRAY (Director,   )
2  Federal Bureau of Investigation);   )
   REGINA LOMBARDO (Acting Deputy  )
3  Director, Bureau of Alcohol, Tobacco,  )
4  Firearms and Explosives); ROB BONTA )
   (California Attorney General), DOES 1  )
5  TO 100.                                )
6              Defendants.               )
                                         )
7                                        )
                                         )
8  _____

9

10      Plaintiffs have been made aware of a related case in Northern

11  District of California. An order on Cross-Motions for Summary

12  Judgment was issued in that case on July 30, 2021. The case is *Stokes v.*

13  *United States Department of Justice, the Attorney General of California,*

14  *et al.,* Case No.: C 19-04613 WHA.

15      Judge William Alsup granted plaintiff's motion and denied the

16  governments' motions, finding that California's mental health

17  commitment procedures under Welfare and Institutions Code § 5250

18  processes is constitutionally flawed and that the failure of either set of

19  defendants to provide relief (i.e., clearance for a firearm purchase

20  background check) to Mr. Stokes violated the Constitution.

21      Judgment was entered but stayed pending any anticipated

22  appeals.

23      A copy of the Order is attached.

24

25          Respectfully Submitted on Aug. 10, 2021,

26           */s/ Donald Kilmer*

27          Attorney for Plaintiffs

28

Donald Kilmer
Attorney at Law
14085 Silver Ridge
Road.
Caldwell, ID 83607
Vc: 408/264-8489
don@dklawoffice.
com

NOTICE OF SUPPLEMENTAL AUTHORITY          *Jane Roe #1, et al., v. United States, et al.*

1

2

3

4

5

6                       UNITED STATES DISTRICT COURT

7

8                       NORTHERN DISTRICT OF CALIFORNIA

9

10   EASTON STOKES,

11              Plaintiff,                          No. C 19-04613 WHA

12        v.

13   UNITED STATES DEPARTMENT              **ORDER RE CROSS-MOTIONS**
     OF JUSTICE, THE ATTORNEY             **FOR SUMMARY JUDGMENT**
14   GENERAL OF CALIFORNIA, et al.,

15              Defendants.

16   _____

17                              **INTRODUCTION**

18        A federal statute imposes a lifetime ban on possession of a firearm for anyone "who has

19   been committed to a mental institution," a statutory term requiring "robust judicial

20   involvement," according to our court of appeals.  In the instant case, a teenager got high and,

21   after a 72-hour treatment, medical personnel "certified" him for a further fourteen-day

22   residential treatment.  No judge was ever involved.  Decades later, he now wishes to inherit

23   two firearms from his grandfather.  This order holds that the "certification" did not (and does

24   not) bar him from possessing the firearms because it did not constitute a "commitment" within

25   the meaning of the federal statute.  Therefore, summary judgment for plaintiff must be

26   **GRANTED**.  Federal defendants' cross-motion for summary judgment must be **DENIED**.  The

27   California Attorney General's motion for summary judgment under the Eleventh Amendment

28   is **DENIED**.

**STATEMENT**

In March 2002, when he was an eighteen-year-old high school senior, plaintiff Easton Stokes ingested psychedelic, psilocybin mushrooms, drank alcohol, and smoked marijuana over a period of several days.  He needed medical help.  His friends and foster family took him to Kaiser Permanente Santa Rosa Hospital.  According to handwritten notes from a doctor on a form titled "PHYSCHIATRY:  DIAGNOSTIC INTAKE EVALUATION (MEDICATION)," plaintiff told the evaluating doctor that (Dkt. No. 79 at 1):

> after binging on psychedelic mushrooms [approximately a week prior,] he ha[d] been having difficulty sleeping, ha[d] been skipping school . . . "not [himself,]" culminating in a night of . . . heavy [marijuana] use last Friday night in which he 'freaked out,' hit a close friend, and other impulsive acts . . . .

Under the section of the form for "Assessment (Brief narrative case summary)," the evaluating doctor wrote (*id.* at 5):

> Pt in the aftermath of hallucinogenic drug binge, who has not fully recovered.  Pt may have been suffering from depression prior to events of past week, but unclear . . . .  Although vague and somewhat disorganized he denied violent or self-destructive urges now.  Agrees to [stop] drug [and alcohol] use . . . .

Plaintiff reported not feeling suicidal or homicidal (*id.* at 7).  Next to "Involuntary Hold (5150)," the staff checked "No" (*id.* at 4).

Later the same day, or the next day, however, the Kaiser personnel transferred him to Oakcrest Psychiatric Hospital, a facility operated by Sutter Health for Sonoma County.  He went transported in a seated position in an ambulance (Stokes Dep. 107:2–14, 110:21–25).  He testified he went voluntarily (*id.* 105:20–106:16).  En route, he heard that he had been designated as a "Section 5150" case (*id.* 133:20–134:1).  And, although plaintiff testified he wanted the treatment and went voluntarily to Oakcrest, he was certified there for a fourteen-day hold under Section 5250 of the California Welfare and Institutions Code.  Oakcrest so notified the California Department of Justice.  He remained at Oakcrest until March 25, when he was discharged (Dkt. No. 79 at 12).

The Oakcrest facility closed years ago and its records are lost to history, so abbreviated Kaiser notes of updates from Oakcrest are all that remain of the treatment at Oakcrest.  While

those notes reference a "probable 14-day hold" at Oakcrest, they do not explain the basis for the fourteen-day hold.  The Kaiser notes go on to reflect outpatient treatment for a few subsequent months, patient improvement, and then a discontinuation by doctors of further treatment during the summer of 2002.

No judge ever reviewed plaintiff's case or committed him.

Despite the hospitalization, plaintiff graduated high school on time and, in the nearly two decades since, has lived a responsible, law-abiding life, the only exception being a misdemeanor conviction for unlawfully carrying a concealed, unloaded pistol in his vehicle in 2006 (Dkt. No. 72 at 17).  Plaintiff earned his Associate of Arts degree from Santa Rosa Junior College in 2005, and his Bachelor of Arts degree in environmental studies from California State University Sonoma in 2010.

In 2010, at 27 years old, plaintiff was diagnosed with a rare form of stage three colon cancer.  Plaintiff's entire large intestine was removed, and he went through twelve rounds of chemotherapy, which caused arthritis, in turn requiring shoulder surgery.  During his cancer treatment, plaintiff grew and sold marijuana to dispensaries to support himself financially since he physically could not work in construction, his usual occupation.  Plaintiff also used marijuana during that period as an anesthetic.  He had licenses for his personal use and commercial growing (Stokes Dep. 26:17–27:3).

Plaintiff is now 38 years old, has a girlfriend, and has no children.  He has never been charged with or convicted of a felony; he has no history of domestic violence; no connection with any gangs or felons; and, other than the 2002 episode when he was eighteen, he has never been treated for mental or emotional problems.

Plaintiff wants to inherit two family heirlooms from his grandfather.  Plaintiff's grandfather served in the United States Air Force in the Second World War as a P-38 fighter pilot.  From November 1944–April 1945, plaintiff's grandfather flew 31 missions, totaling 167 combat hours, over Europe.  Plaintiff's grandfather retired from the Air Force as a lieutenant colonel in 1964.  Plaintiff wants to inherit his grandfather's service sidearm, an Ithaca 1911, .45 caliber Colt sidearm.  The second family heirloom is a Winchester 1894, .30 caliber

1    hunting rifle, manufactured in 1906, used by his great grandfather in his occupation as a

2    government hunter in Grants Pass, Oregon.  Neither weapon is an assault rifle.  Neither has an

3    oversize magazine.

4    In 2016, in anticipation of inheriting the firearms, plaintiff submitted a personal firearms

5    eligibility check (PFEC) to the California Department of Justice, Bureau of Firearms.  That

6    agency replied that he was ineligible to possess or purchase firearms but gave no explanation

7    (Dkt. No. 1-1 at 3).  In response to plaintiff's inquiry concerning the restriction, the National

8    Instant Criminal Background Check System (NICS) section of the FBI informed plaintiff only

9    that (Dkt. No. 1-1 at 5):

> California does not utilize the NICS system to conduct PFEC.
> Therefore, the Appeal Services Team of the FBI Criminal Justice
> Information Services (CJIS) Division's NICS Section is not
> required to consider appeals of denials by state or local agencies
> that do not utilize the NICS system.

13   Although the letters from the California DOJ and NICS did not state a reason for denying

14   plaintiff's personal firearms eligibility check, a certification of firearms prohibition from the

15   California DOJ stated that the effective date of plaintiff's prohibition was March 12, 2002,

16   with the basis simply being:  "PROHIBITION/5250 — 5250 WIC — DTSO OR GRAVELY

17   DISABLED" (Dkt. No. 89 at 42).  This was shorthand for Section 5250 of the California

18   Welfare and Institutions Code and for danger to self or others or gravely disabled.

19   Federal law prohibits a person "who has been adjudicated as a mental defective or who

20   has been committed to a mental institution" from possessing a firearm or ammunition.

21   18 U.S.C. § 922(g)(4).  Federal law has provided two potential avenues for relief from this

22   lifetime ban, but both have long been foreclosed to all California residents.  *First*, before 1992,

23   a person in plaintiff's position could have applied to the United States Attorney General for

24   relief under 18 U.S.C. § 925(c), which provided that the Attorney General could grant relief if

25   the Attorney General was satisfied "that the applicant will not be likely to act in a manner

26   dangerous to public safety and that the granting of the relief would not be contrary to the

27   public interest."  Since 1992, however, Congress has prohibited the use of funds to act on such

28   applications, disabling the program.  *See United States v. Bean*, 537 U.S. 71 (2002).  *Second*,

United States District Court
Northern District of California

4

the states may establish programs under 34 U.S.C. § 40915 to provide opportunity for relief from the ban of Section 922(g)(4).  Thirty-one states and two tribal governments have established such programs, but California has not.  BUREAU OF JUSTICE STATS., *NICS Act Record Improvement Program (NARIP) Awards FY 2009–2020* (June 12, 2021, 9:00 PM), https://bjs.ojp.gov/programs/nics-improvement-amendments-act/state-profiles#gqumc.  Thus, as the law now stands, plaintiff Stokes (and all other Californians certified for Section 5250 fourteen-day treatments) are banned for life from possessing a firearm with no opportunity for relief, according to defendants.

Plaintiff filed this lawsuit in August 2019 against various federal, state, and local agencies and officials, including the Attorney General of the United States and the Attorney General of California.  Plaintiff asserts that his constitutional right to possess firearms, to due process, and to equal protection have been violated by reason that he is prohibited for life from owning a firearm merely because of his 2002 psychiatric treatment.

Defendants moved to dismiss the complaint.  An order denied the motion, finding appropriate further factual development regarding the circumstances of plaintiff's 2002 psychiatric treatment, his criminal history, his mental health history (including familial), and his education and employment.

Plaintiff has provided records from Kaiser Permanente Santa Rosa Hospital relating to his initial evaluation and treatment and to his follow-up appointments after being released. We do not have, as is already apparent, records relating to plaintiff's fourteen-day treatment at Oakcrest Psychiatric Hospital.  That county hospital ceased operating in or about 2007.  No one can find its records.  So, we have no Oakcrest files explaining the fourteen-day treatment, the specific facts supporting that decision, or the procedures used to arrive at that certification.

Upon the suggestion herein by the California Attorney General that an ad hoc state court proceeding might be available to relieve plaintiff of the federal prohibition, an order asked plaintiff to test that possibility.  Specifically, on October 22, 2020, an order asked plaintiff to file a petition in the California Superior Court for any and all such relief, including (Dkt. No. 68):

- the extent to which the original commitments were involuntary;

- the extent to which plaintiff willingly consented to the commitment;

- whether relief from any disability should now be granted to plaintiff based on his adult life so that he may possess the firearms in question; and

- any other relief or findings.

Accordingly, on November 4, 2020, plaintiff filed a "request for a hearing and declaratory relief" in Sonoma County Superior Court seeking "relief from the certification of Plaintiff for intensive treatment pursuant to Welfare and Institutions Code section 5250 and/or accompanying lifetime firearms prohibition pursuant to 18 U.S.C. Section 922(g)" (Dkt. No. 73 at 41). That proceeding has gone nowhere and seems doomed to failure.[1]

No one in this action contends that California has established a program for relief from disabilities within the meaning of 34 U.S.C. § 40915. While Section 8103 of California's Welfare and Institutions Code provides opportunity for relief from the state firearms disability, the state prohibition lasts only five years, so the relief provided by Section 8103 is no longer available to plaintiff because more than five years have passed since his 2002 certification. Moreover, the state program would not satisfy the federal requirements for such a state program under 34 U.S.C. Section 40915. For example, Section 40915 requires that the state program grant relief if the circumstances regarding the prior commitment "and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest . . . ." Under Section 8103, by contrast, the superior court may grant relief if it finds simply that

---

[1] Plaintiff represents that Superior Court Judge Jennifer Dollard informed plaintiff's counsel that she was "unfamiliar with the petition" but suggested it should be filed with the clerk of the criminal department. The clerk of the criminal department told plaintiff's counsel the criminal department did not accept such petition and the petition should be filed with the civil department. The clerk of the civil department told plaintiff's counsel that the clerk was "unfamiliar with the proper protocol" but suggested that the petition should be handled by the probate department where, plaintiff's counsel represents, it is now pending as of July 16, 2021, with no hearing date set (Dkt. No. 107). According to plaintiff's counsel, the clerk of the probate department stated that the clerk was aware of such petitions but could not recall having seen such a petition after the California five-year term of prohibition had expired (*ibid.*).

United States District Court
Northern District of California

"the person would be likely to use firearms in a safe and lawful manner . . . ."  California's

program does not qualify under Section 40915 because it does not require a finding that

granting relief would not be contrary to the public interest.

Federal defendants moved for summary judgment, relying on *Mai v. United States*,

952 F.3d 1106 (9th Cir. 2020).  The California Attorney General moved for judgment on the

pleadings on the ground that the Eleventh Amendment barred plaintiff's action against him.

An order denied those motions without prejudice and requested the parties to submit

fresh, cross-motions for summary judgment based on the supplemented record and asked

counsel to include two issues (Dkt. No. 87):

> (i)  "Additionally, commitments under state-law procedures
> that lack robust judicial involvement do not qualify as
> commitments for purposes of § 922(g)(4)."  *Mai v. United States*,
> 952 F.3d 1106, 1110 (9th Cir. 2020).  In light of this sentence, does
> the 2002 proceeding against plaintiff Stokes qualify as a
> "commitment"?

> (ii)  The arguable denial of the equal protection of the laws
> by reason that plaintiff is denied an opportunity to show his current
> fitness to possess firearms under 34 U.S.C. § 40915 simply
> because California has not established such a program and federal
> law does not require it.

This order follows two hearings and several rounds of briefing.  Because this order rules

for plaintiff on the first statutory question, it does not need to reach the constitutional issue

raised in the second question.

## ANALYSIS

Federal law prohibits a person "who has been adjudicated as a mental defective or

who has been committed to a mental institution" from possessing a firearm or ammunition.

18 U.S.C. § 922(g)(4).  In enacting Section 922(g), Congress sought "to keep firearms out of

the hands of presumptively risky people."  *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103,

112, n.6 (1983).  "Congress determined that, like felons and domestic-violence assailants,

those who have been involuntarily committed to a mental institution also pose an increased risk

of violence."  *Mai v. United States*, 952 F.3d 1106, 1117 (9th Cir. 2020).

Here, all agree that plaintiff has never been "adjudicated to be a mental defective."  At all material times, the implementing ATF regulation defined "committed to a mental institution" as follows:

> *Committed to a mental institution*.  A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority.  The term includes a commitment to a mental institution involuntarily.  The term includes commitment for mental defectiveness or mental illness.  It also includes commitments for other reasons, such as for drug use.  The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

27 C.F.R. § 478.11.

In *Mai*, our court of appeals upheld Section 922(g)(4) against an as-applied Second Amendment challenge.  There, a Washington state court had committed Duy Mai "involuntarily for mental health treatment after he threatened himself and others.  The state court determined that Plaintiff was *both* mentally ill *and* dangerous." *Id.* at 1110 (emphasis in original).  There, Mai argued Section 922(g)(4)'s categorical, lifetime ban violated his Second Amendment right to own a firearm because his involuntary commitment some twenty years prior did not establish his current dangerousness or mental unfitness to own a firearm. Since his involuntary commitment at seventeen years old, he had "earned a GED, a bachelor's degree, and a master's degree.  He [was] gainfully employed and a father to two children. According to the complaint, he no longer suffer[ed] from mental illness, and he live[d] 'a socially-responsible, well-balanced, and accomplished life.'" *Ibid.*  Indeed, Mai had successfully petitioned a Washington state court to reinstate his right to own a firearm under *state* law by showing, in part, that he had "successfully managed the condition related to his commitment; [he] no longer present[ed] a substantial danger to himself, or the public; and the symptoms related to the commitment [were] not reasonably likely to recur." *Ibid.* (citation omitted).

Nevertheless, our court of appeals held that Section 922(g)(4)'s lifetime firearm ban did not violate the plaintiff's Second Amendment rights.  Our court of appeals held Section 922(g)(4) survived intermediate constitutional scrutiny. *Id.* at 1109.

8

Significantly, however, our court of appeals stated: "Involuntary commitments comport with due process only when the individual is found to be *both* mentally ill *and* dangerous." *Id.* at 1110 (emphasis in original). *Mai* further stated: "Additionally, commitments under state-law procedures that lack robust judicial involvement do not qualify as commitments for purposes of § 922(g)(4)." *Ibid.* (citing *United States v. Rehlander*, 666 F.3d 45, 47–49 (1st Cir. 2012)). This will become important, for here it is undisputed that no judge ever became involved in our plaintiff's case, and he was never specifically found to be mentally ill and dangerous (as opposed to gravely disabled).

### 1. CALIFORNIA'S CERTIFICATION SCHEME.

Defendants insist that any and all certifications under Section 5250 are necessarily involuntary and necessarily satisfy the *Mai* test. The following review of the California certification scheme shows that this is not quite so.

California's Lanterman-Petris-Short Act, Cal. Welf. & Inst. Code §§ 5000 *et seq.*, remains "a comprehensive scheme designed to address a variety of circumstances in which a member of the general population may need to be evaluated or treated for different lengths of time." *Cooley v. Superior Ct.*, 29 Cal. 4th 228, 253 (2002).[2]

At all material times, the statute authorized two broad steps in treatment. The first, under Section 5150, provided that a peace officer, attending staff of a mental health evaluation facility, or other professional person designated by the county, could cause a person to be taken into custody for 72-hour treatment and evaluation at a facility designated by the state for such purpose, upon probable cause that, because of a mental disorder, the person was a danger to others, himself, or gravely disabled. Section 5150 required the officer, staff person, or other professional who caused the person to be taken into custody at the facility to state the circumstances giving probable cause in a written application to the facility, including if probable cause was based on the statement of another person, for example, a friend or family

---

[2] Some of the relevant code provisions have been amended since 2002. References are to the versions of the Welfare and Institutions Code provisions in effect when plaintiff had his psychiatric episode, available under the "History" tabs for each code section on Westlaw.com.

United States District Court
Northern District of California

member of the person being detained.  Section 5150 provided no hearing.  Defendants do not contend this procedure constituted a "commitment."

The second, under Section 5250, authorized a further "certification" by hospital staff for fourteen days.  At all material times, a Section 5250 commitment was subject to judicial review only by way of habeas corpus relief with the burden placed on the patient to seek such review.  Defendants *do* contend all such Section 5250 certifications necessarily constituted "commitments" under Section 922(g)(4).  Defendants further insist that we must presume the California statutes were followed and that plaintiff's certification was involuntary and in compliance with *Mai*.  As the following details show, however, this was *not* necessarily so.

At all material times, Section 5250 provided:

> If a person is detained for 72 hours [under Section 5150] and has received an evaluation, he or she may be certified for not more than 14 days of intensive treatment related to the mental disorder or impairment by chronic alcoholism, under the following conditions:
>
> (a)    The professional staff of the agency or facility providing evaluation services has analyzed the person's condition and has found the person is, as a result of mental disorder or impairment by chronic alcoholism, a danger to others, or to himself or herself, or gravely disabled.
>
> (b)    The facility providing intensive treatment is designated by the county to provide intensive treatment, and agrees to admit the person.  No facility shall be designated to provide intensive treatment unless it complies with the certification review hearing required by this article.  The procedures shall be described in the county Short-Doyle plan as required by Section 5651.3.
>
> (c)    The person has been advised of the need for, but has not been willing or able to accept, treatment on a voluntary basis.

Note well that Section 5250 provided that the hospital staff could certify the person if he or she was "gravely disabled" (but not necessarily a danger to anyone).  In turn, Section 5008 provided that "gravely disabled" meant, as relevant:  "A condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food,

10

United States District Court
Northern District of California

clothing, or shelter." Note, too, that chronic alcoholism rather than mental disorder would be enough.

After certifying the person under Section 5250, the facility "immediately" was required by Section 8103(g) to submit a report to California DOJ to register the person in the agency's mental health firearms prohibition system as a person prohibited from possessing a firearm by reason of the Section 5250 certification. The California Attorney General has submitted a declaration from Gilbert Mac, a staff services manager who maintains the California DOJ's mental health reporting system (Mac Decl. ¶ 3). According to his declaration, the California DOJ would not have evaluated the reports submitted by the facilities for errors (*id.* ¶ 14). Again, the Section 5250 fourteen-day "certification" constituted, according to defendants, the "commitment" under 18 U.S.C. § 922(g)(4). Under the California scheme, that "commitment" would occur without any judicial involvement.

Under the California statute, the facility then informed the patient of the certification. Section 5252 provided a form of notice of certification to be filled out by the certifying physician or staff. The form recited that: "The above-named person has been informed of this evaluation, and has been advised of the need for, but has not been able or willing to accept treatment on a voluntary basis . . . ." Note that Section 5250 did not require an express refusal by the patient for treatment. If the patient was merely "not able to accept" treatment on a voluntary basis, then he could be certified.

In the signature block (for signatures of the certifying staff), the statutory form further prescribed:

> I hereby state that I delivered a copy of this notice this day to the above-named person and that I informed him or her that unless judicial review is requested a certification review hearing will be held within four days of the date on which the person is certified for a period of intensive treatment and that an attorney or advocate will visit him or her to provide assistance in preparing for the hearing or to answer questions regarding his or her commitment or to provide other assistance. The court has been notified of this certification on this day.

This was the first time the statutory scheme referenced the possibility of "judicial review" or referenced "the court."

11

Section 5254 referenced two competing types of reviews, an internal hospital review versus judicial review:

> The person delivering the copy of the notice of certification to the person certified shall, at the time of delivery, inform the person certified that he or she is entitled to a certification review hearing, to be held within four days of the date on which the person is certified for a period of intensive treatment in accordance with Section 5256 unless judicial review is requested, to determine whether or not probable cause exists to detain the person for intensive treatment related to the mental disorder or impairment by chronic alcoholism.  The person certified shall be informed of his or her rights with respect to the hearing, including the right to the assistance of another person to prepare for the hearing or to answer other questions and concerns regarding his or her involuntary detention or both.

Under this provision, any patient who sought judicial review would not receive any internal hospital review.[3]

Section 5254.1 specifically required notice to "the person certified" of his or her legal right to a judicial review by habeas corpus:

> The person delivering the copy of the notice of certification to the person certified shall, at the time of delivery, inform the person certified of his or her legal right to a judicial review by habeas corpus, and shall explain that term to the person certified, and inform the person of his or her right to counsel, including court-appointed counsel pursuant to Section 5276.

If the certified person did not initiate judicial review by requesting release (our plaintiff did not), Section 5256 required an internal certification review hearing within four days of the certification.  Section 5256.1 provided that "either a court-appointed commissioner or a referee, or a certification review hearing officer" conducted the certification review hearing.  No judge was involved in any such internal certification review hearing.  Section 5256.2 provided that a person designated by the director of the facility presented the evidence in support of the certification.  Sections 5256.3 and 5256.4 provided the rights of the certified person at the certification review hearing, including:  to be present at the hearing; to assistance

---

[3]  Consistent with Section 5254, the patient handbook available on the internet advises today that "If you request a writ of habeas corpus . . . you will give up your right to have a certification review hearing."  CAL. DEP'T OF HEALTH CARE SERVS., HANDBOOK, RIGHTS FOR INDIVIDUALS IN MENTAL HEALTH FACILITIES 11 (2014) https://www.dhcs.ca.gov/services/Documents/DHCS_Handbook_English.pdf.

United States District Court
Northern District of California

by an attorney; to present evidence; to examine witnesses; and to make reasonable requests for the attendance of facility employees who participated in the certification.

Section 5256.6 provided:

> If at the conclusion of the certification review hearing the person conducting the hearing finds that there is not probable cause to believe that the person certified is, as a result of a mental disorder or impairment by chronic alcoholism, a danger to others, or to himself or herself, or gravely disabled, then the person certified may no longer be involuntarily detained.  Nothing herein shall prohibit the person from remaining at the facility on a voluntary basis or the facility from providing the person with appropriate referral information concerning mental health services.

Note that this section specifically contemplated that if probable cause was lacking, the person certified could no longer be "involuntarily detained" but that the person could remain "at the facility on a voluntary basis."  Note again that "gravely disabled" alone, as opposed to dangerousness, would be sufficient to authorize involuntary detention under Section 5256.6. And, chronic alcoholism, rather than mental disorder, would be sufficient as the underlying cause.

If the person certified was held for treatment, Section 5256.7 required written notification to the patient of the decision and notice again of his right to request release and to have a hearing thereon before the superior court.  "A copy of the decision and the certification made pursuant to Section 5250 or 5270.15 shall be submitted to the superior court."  No review or action by the court was required, however, unless the patient initiated a petition for a writ of habeas corpus.

Section 5275 provided the following right to a hearing by way of habeas corpus:

> Every person detained by certification for intensive treatment shall have a right to a hearing by writ of habeas corpus for his or her release after he or she or any person acting on his or her behalf has made a request for release to either (a) the person delivering the copy of the notice of certification to the person certified at the time of the delivery, or (b) to any member of the treatment staff of the facility providing intensive treatment, at any time during the period of intensive treatment pursuant to Section 5250 . . . .

United States District Court
Northern District of California

13

1

Section 5275 further provided that the person delivering a copy of the certification notice or

2

any member of the treatment staff to whom the patient made a request for release was required

3

to provide a form for the patient to sign requesting his or her release.

4

The last paragraph of the next provision, Section 5276, provided:

5

> The court shall either release the person or order an evidentiary
> hearing to be held within two judicial days after the petition is
> filed.  If the court finds, (a) that the person requesting release is
> not, as a result of mental disorder or impairment by chronic
> alcoholism, a danger to others, or to himself or herself, or gravely
> disabled, (b) that he or she had not been advised of, or had
> accepted, voluntary treatment, or (c) that the facility providing
> intensive treatment is not equipped and staffed to provide
> treatment, or is not designated by the county to provide intensive
> treatment he or she shall be released immediately.

6

7

8

9

10

Immediate release was required if the patient had accepted "voluntary treatment," meaning that

11

even though the patient had been "certified," he could not be further detained if he had

12

accepted voluntary treatment.  Note again that "gravely disabled" was sufficient to require

13

detention (as opposed to dangerousness) and, once again, that chronic alcoholism, rather than

14

mental disorder, was sufficient as the underlying cause.

15

Upon discharge or before, the facility was required by Section 8103(g)(3) to inform the

16

patient that under California law he or she was prohibited for five years from owning or

17

possessing a firearm, subject to a court hearing to restore his or her right to a firearm.  No

18

information about the lifelong federal ban was required.  In fact, at no time in the entire

19

process did the California scheme require notice of the lifelong federal ban.

20

This order has detailed the California statutory scheme because defendants have insisted

21

that we cannot go behind the certification in the California DOJ records and we must

22

necessarily find, based on the statute alone, that plaintiff was involuntarily committed in full

23

compliance with *Mai*.  The details of the statutory scheme, however, do not compel this

24

assertion, even under the defense presumption of full statutory compliance.

25

Instead, these points emerge from the California procedure.  *First*, no judge would ever

26

be involved in the Section 5250 certification, which is what defendants contend was the

27

"commitment."  *Second*, a Section 5250 certification could be merely based on being "gravely

28

United States District Court
Northern District of California

14

disabled" rather than any danger to self or others and could be based on chronic alcoholism rather than mental disorder (as the underlying cause). *Third*, a Section 5250 certification could be based on the patient being unable to accept treatment voluntarily rather than unwilling to accept treatment voluntarily. *Fourth*, once a patient became certified, the burden was on the patient to seek release via habeas corpus. *Fifth*, seeking habeas corpus would cancel any internal certification review by the hospital. *Sixth*, the statutory notice to be given the patient failed to warn that a failure to seek judicial review would result in a lifelong forfeiture of the constitutional right to possess a firearm. *Seventh*, the statutes allowed a superior court to order release of a patient (upon a proper showing) but did not provide that the certification itself would be vacated.

    **2.**    APPLICATION OF *MAI* STANDARD.

No records have survived to show what happened, if anything, with respect to plaintiff's "certification" for a fourteen-day treatment. Plaintiff testified he acquiesced in treatment voluntarily. The facility was supposed to report all Section 5250 certifications to the California DOJ on a "Mental Health Facilities Report of Firearm Prohibition Form 4009A," according to a California DOJ Information Bulletin dated May 22, 2007. CAL. DEP'T OF JUSTICE, DIV. OF LAW ENFORCEMENT, INFORMATION BULLETIN, MENTAL HEALTH REPORTING REQUIREMENTS (2007), https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/infobuls/2007BF-04.pdf. No such form has survived for plaintiff's case. All that remains is a computer entry in the California DOJ bureau of firearms system stating "PROHIBITION/5250 — 5250 WIC — DTSO OR GRAVELY DISABLED."

Nevertheless, three points are clear.

*First*, there was no judicial involvement, much less "robust judicial involvement," so under *Mai*, there was no "commitment" within the meaning of Section 922(g)(4). To be sure, under the ATF regulation, a "commitment" could include a "formal commitment of a person to a mental institution by a court, *board, commission, or other lawful authority*." 27 C.F.R. § 478.11 (emphasis added). The statute itself, however, used only the term "who has been adjudicated as a mental defective or who has been committed to a mental institution" (without

15

referencing a board, commission, or other lawful authority).  Taking note of the intervening

importance of the Second Amendment right to bear arms established in *District of Columbia v.*

*Heller*, 554 U.S. 570 (2008), the First Circuit limited the statutory phrase to *judicial*

commitments and stated the following reason:

> But in Section 922, Congress did not prohibit gun possession by
> those who were or are mentally ill and dangerous, and such a free
> floating prohibition would be very hard to administer, although
> perhaps not impossible.  This is why, as with the ban on prior
> felons, Congress sought to piggyback on determinations made in
> *prior judicial proceedings* to establish status.

*United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012) (emphasis in original).  Our own

court of appeals followed (and cited) the First Circuit's lead in this respect and restricted the

statutory term to those commitments with "robust judicial involvement."  The term "applies

only to those who were found, through procedures satisfying due process, *actually* dangerous

in the past."  *Mai*, 952 F.3d at 1121 (emphasis in original).

  *Second*, the certification does not establish that our plaintiff was found to be both

mentally ill and dangerous, as required by *Mai*.  Instead, he was found to be "DTSO

[Dangerous to Self or Others] OR GRAVELY DISABLED."  But which was it?  Gravely

disabled?  Or DTSO?  It matters.  *Mai* held:  "Involuntary commitments comport with due

process only when the individual is found to be *both* mentally ill *and* dangerous."  952 F.3d at

1110 (emphasis in original).  *Mai* added that Section 922(g)(4) "applies only to those found,

through procedures satisfying due process, *actually* dangerous in the past."  *Id.* at 1121

(emphasis in original).  Grave disablement is not enough under *Mai*.  Therefore, the ambiguous

finding of dangerous *or* disabled was not specific or clear enough.  This, too, means there was

no "commitment" under *Mai*.

  *Third*, contrary to defendants' assertions, Section 5250 certifications could be based on

being *unable* to accept treatment voluntarily, rather than, as defendants presume, being

*unwilling* to accept treatment voluntarily.

  Therefore, defendants were wrong to deny Stokes a firearm permit on account of the

Section 5250 certification.

United States District Court
Northern District of California

16

1

2
### 3.    THE GOVERNMENT'S WAIVER ARGUMENT.

3
With respect to the first of the three grounds stated above pertaining to "robust judicial

4
involvement," the government argued at a hearing on June 17, 2021, that plaintiff had

5
"waived" his right to judicial involvement by not applying for habeas corpus relief.

6
Specifically, counsel stated (Tr. 4:24–6:7, 7:15–17):

7
> California's procedures certainly do have robust judicial
> proceedings.  Mr. Stokes chose not to avail himself of them . . . .

8
> In addition, the not — neither the Ninth Circuit nor the First
> Circuit ever stated that the judicial proceedings were non-waivable

9
> under any circumstances.

10
> And if you look at *Phelps v. Bosco* [711 Fed. App'x 63 (2nd Cir.
> 2018)], the Second Circuit case, they specifically upheld a

11
> 922(g)(4) ban, even though, as here, the plaintiff was offered and
> declined to have the judicial proceedings that were available to

12
> him.

13
> So in this case, the state law does have the judicial proceeding.
> Plaintiff declined to opt to avail himself of them.  There is nothing

14
> stating that persons in — who are committed are not allowed to
> waive these conditions.

15

16
> So I think that that is clear, that here it does count as a
> disqualifying commitment; otherwise, anyone who was committed
> could simply waive their judicial hearing and then state:  "Well,

17
> since I didn't have a court hearing, I can't have a ban under
> 922(g)(4)."

18

19
                        *          *          *

20
> I think the statute clarifies how the procedure works.  In this case,
> the plaintiff testified in his deposition that he was told of this

21
> ability to go to court and he declined it.

22
No decision has ever blessed this waiver argument but neither has any precisely rejected

23
it, so this order will give it plenary consideration.  A variation of the government's waiver

24
argument was made in the First Circuit case and rejected by the court of appeals.  *United States*

25
*v. Rehlander*, 666 F.3d 45 (1st Cir. 2012).  *Rehlander* is as close as any appellate court has

26
come to addressing a waiver argument under Section 922(g)(4), but is not really on point.

27
Government counsel's citation to the Second Circuit decision in *Phelps v. Bosco*, 711

28
Fed. App'x 63 (2018), is also not on point.  There, the court of appeals refused to consider

United States District Court
Northern District of California

17

1    certain issues because Phelps had not raised them in his opening brief and had thus waived

2    them.  Also, Phelps had not raised any constitutional issue on appeal, so the Second Circuit

3    declined to consider them and specifically declined to consider "whether concern for these

4    constitutional rights might change our interpretation of the word 'commitment' under New

5    York's scheme."  *Id.* at 65.  There was no waiver issue in *Phelps* remotely akin to the waiver

6    argument advanced by government counsel.

7        *Mai* did not set out a waiver exception.  Its most relevant points were:

8            Involuntary commitments comport with due process only when
             the individual is found to be *both* mentally ill *and* dangerous.
9            *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

10   952 F.3d at 1110 (emphasis in original).

11       In the next sentence, citing to the First Circuit decision, *Mai* added:

12           Additionally, commitments under state-law procedures that lack
             robust judicial involvement do not qualify as commitments for
13           purposes of § 922(g)(4).  *United States v. Rehlander*, 666 F.3d 45,
             47–49 (1st Cir. 2012).
14
     *Ibid.*
15
         Near the end of its opinion, *Mai* stated:
16
             Finally, § 922(g)(4)'s prohibition as to those who were committed
17           involuntarily applies not to persons who *theoretically* might be
             dangerous at some point in their lives.  Instead, it applies only to
18           those who were found, through procedures satisfying due process,
             *actually* dangerous in the past.
19
     *Id.* at 1121 (emphasis in original).
20
         The government's argument reduces to a waiver based on (i) notice to the patient of a
21
     right to seek a writ of habeas corpus plus (ii) the failure to do so.
22
         A waiver must be knowing and voluntary.  *See Boykin v. Alabama*, 395 U.S. 238, 242
23
     (1969).  To be knowing, the patient must be of sound enough mind to understand his or her
24
     right.  *See Godinez v. Moran*, 509 U.S. 389, 396 (1993).  It must also be informed, meaning he
25
     or she must be informed of his or her rights and the consequences.  To be voluntary, the waiver
26
     must be free of compulsion or pressure.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).
27

28

United States District Court
Northern District of California

1          The burden of establishing a waiver is on the party asserting waiver.  *See Prieto v. Paul*

2   *Revere Life Ins. Co.*, 354 F.3d 1005, 1012 (9th Cir. 2004).  Here, the record does not establish

3   a valid waiver.

4          Despite the absence of records, the government contends that here the Section 5250

5   "certification" necessarily constituted an *involuntary* commitment.  Recall as well that *Mai*

6   insists that commitments under Section 922(g)(4) must be based on "mental illness."

7   The government's argument, therefore, reduces to the manifest contradiction that someone

8   who is so mentally ill that he or she must be involuntarily confined nevertheless has sufficient

9   soundness of mind to knowingly and intelligently waive his or her right to seek judicial review.

10  This counterfeit logic is self-cancelling.

11         Moreover, was any waiver here informed?  The answer is no.  Although the California

12  statute required notice of his right to seek habeas corpus review, the statutory notice did not

13  advise that acquiescing in the fourteen-day detention would result in a lifetime ban on owning

14  or possessing a firearm or ammunition.  Such a notice should have been given if any state or

15  federal government wanted to later say that the fourteen-day treatment would forfeit his

16  Second Amendment rights for the rest of his life.  *See United States v. Bonilla*, 637 F.3d 980

17  (9th Cir. 2011); *see also United States v. Gonzales*, 884 F.3d 457 (2d Cir. 2018).

18         To return to where we began, plaintiff's certification was never vetted by any judge.

19  There was no judicial involvement whatsoever, much less any "robust judicial involvement."

20  Unlike in *Mai* involving the Washington regime, the California procedure did not

21  automatically require judicial involvement up front.  The government has not carried its burden

22  to show that plaintiff knowingly and voluntarily made an informed waiver.

23         In summary, under *Mai*, plaintiff's Section 5250 "certification" was not a "commitment"

24  within the meaning of Section 922(g)(4) and defendants may not withhold his firearm permit

25  on that ground.

26      **4.     THE GOVERNMENT'S CLARIFICATION.**

27         In response to an inquiry why the federal defendants never filed an answer (and thus how

28  any waiver argument was even preserved), counsel quoted an order early on of the Court

United States District Court
Northern District of California

19

stating (Dkt. No. 49):  "For the above-stated reasons, defendant's motion to dismiss is Denied.

Discovery should proceed for approximately ninety days until April 22, 2020, after which the

parties may move for summary judgment . . . ."  But that order never deleted the requirement

for an answer (and in fact all other defendants did file an answer).

The federal defendants used the recent inquiry as an occasion to further repackage their

waiver argument as follows (Dkt. No. 106):

> Federal Defendants confirm that they were addressing the issue
> of whether availability of robust judicial proceedings satisfied
> the legal requirements of section 922(g)(4), and not asserting
> an affirmative equitable defense of waiver.  Federal Defendants
> continue to maintain that the statutory structure of California law
> (Lanterman-Petris-Short Act, Cal. Welf. & Inst. Code §§ 5000
> et seq.), pursuant to which Plaintiff was involuntarily committed,
> meets the requirements of section 922(g)(4).  Plaintiff was entitled
> to a judicial hearing at any time during his commitment and aware
> of that fact; Federal Defendants did not and are not arguing that
> they have an affirmative equitable defense of waiver based on
> Plaintiff's failure to use the procedures available to him.  Rather,
> Federal Defendants argued and continue to maintain that Plaintiff's
> failure to use the procedures available under California law does
> not create a constitutional problem such that Plaintiff is now
> entitled to the relief he seeks from this Court.

Respectfully, this still amounts to a waiver argument, namely that the California scheme

allowed plaintiff, after being certified, to go to superior court to obtain his freedom but it was

his own choice to spurn that opportunity.  But *Mai* held that Section 922(g)(4)'s prohibition

applied only to those "who were found, through procedures satisfying due process, [to have

been] *actually* dangerous in the past."  952 F.3d 1106, 1121 (emphasis in original).  Given the

ambiguous disjunctive "or" used in the certification at issue, we cannot say now that even a

doctor, much less a judge, found he was anything other than "gravely disabled" (as opposed to

actually dangerous).

To repeat the First Circuit's reasoning, generally approved in *Mai*, "as with the ban on

prior felons, Congress sought to piggyback on determinations made in *prior judicial

proceedings* to establish status."  *Rehlander*, 666 F.3d at 50.  Here, there was no prior judicial

proceeding on which to piggyback.  California's scheme relegated judicial review to an after-

the-fact optional hearing with the burden placed on the certified person to seek it rather than, as

in the Washington and Maine schemes, a judicial hearing up front with an adversarial process and a judicial record serving as the foundation for the lifelong ban.  That difference is critical.

### 5.    PLAINTIFF'S CLAIM THAT HIS COMMITMENT WAS VOLUNTARY.

Plaintiff testified herein that he *voluntarily* accepted all treatments in question. (And thus, under the ATF regulation, his voluntary admission was not a "commitment" under Section 922(g)(4).)

Defendants' persistent reply has been to argue that Section 5250 authorized only involuntary certifications (an argument rejected above).  An amendment to the California scheme in 2018, however, illuminates the probable truth of plaintiff's testimony.  Assembly Bill No. 2983 (approved September 27, 2018) had as its purpose to address the problem of hospitals requiring voluntary patients to be placed on a Section 5150 hold as a condition of treatment:

> **PURPOSE OF THIS BILL**.  According to the author, patients with mental health needs often seek care in the ED [emergency department] on a voluntary basis.  After a medical screening exam by an emergency physician, some patients need additional psychiatric services not available at that hospital, requiring transfer by ambulance to a psychiatric hospital to receive a higher level of mental health care.  *The author states that a survey of emergency physicians in California revealed that, almost universally, hospitals require voluntary patients to be placed on a 5150 hold or they will not accept transfer of that patient from the ED, however, there is no such mandate in law.*  The author notes that the LPS Act [Lanterman-Petris-Short Act], which provides the statutory framework for community mental health services and the provisions for handling involuntary civil commitments of persons with mental health disorders was developed with the intent "to end the inappropriate, indefinite, and involuntary commitment of persons with mental health disorders," and a 5150 hold is the mechanism that exists to force treatment on a person when they are a danger to themselves, others, or are gravely disabled.  However, if those criteria are not met and a person is voluntarily seeking treatment, a 5150 is not warranted.  The author asserts that the requirement of an involuntary hold by receiving hospitals creates an unnecessary barrier to care for patients, is a violation of the persons civil liberties, does not exist for any other health care condition, and unreasonably stigmatizes patients with mental illness who are voluntarily seeking treatment.  The author concludes that this bill defends civil liberties by clarifying that hospitals may not require a patient seeking voluntary mental health care to be on a 5150 hold as a condition of accepting transfer of that patient from an ED.

United States District Court
Northern District of California

21

Cal. Bill Analysis, Assem. Comm. on Health, 2017–2018 Reg. Sess., A.B. 2983, at 2 (Cal. April 17, 2018) (emphasis added). *This "universal" scenario, corrected by the 2018 amendment, tracks exactly what plaintiff says happened to him* (Stokes Dep. 106:8–107:14, 133:14–25). (This practice evidently was done to secure funding to pay for voluntary treatment.) Oakcrest designated him under Section 5150, a necessary precursor to a Section 5250 certification, and then documented his treatment as a Section 5250 case. This order accepts plaintiff's testimony and finds that he voluntarily sought admission to both hospitals for treatment. This is an alternative ground for decision.

### 6.   THE CALIFORNIA ATTORNEY GENERAL'S MOTION IS DENIED.

The California Attorney General argues that the Eleventh Amendment bars this suit against him.

"The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest. Thus, the general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter. And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984) (cleaned up).

The Supreme Court has recognized an exception to the immunity under the Eleventh Amendment in *Ex parte Young*, 209 U.S. 123 (1908). The *Ex parte Young* exception applies to "suits for prospective declaratory and injunctive relief against state officers, sued in their official capacities, to enjoin an alleged ongoing violation of federal law." *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045 (9th Cir. 2000). "Under *Ex parte Young*, the state officer sued must have some connection with the enforcement of the allegedly unconstitutional act. This connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (cleaned up).

United States District Court
Northern District of California

The California Attorney General acknowledges that California law does not now prohibit plaintiff from owning or possessing a firearm (Dkt. No. 89 at 10, n. 4).  Thus, only federal law is at issue.

The California Attorney General argues there is no causal connection between himself and plaintiff's injury.  That is not quite true because the California Attorney General received the report of plaintiff's Section 5250 certification from the facility and, without reviewing it, passed it through to NICS.  In order to provide relief to plaintiff, it may be required that the California Attorney General undo the damage he has caused by correcting the entry in his own database.  It will also likely benefit our court of appeals to have the California Attorney General participate in the appeal in case questions about the California scheme arise. Otherwise, the motion would be granted, but, for now, it is **DENIED**.

## CONCLUSION

The federal defendants and state defendants shall issue plaintiff his firearm permit for the two firearms in question.  This order, however, is **STAYED PENDING RESOLUTION OF ALL APPEALS**.  Final judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated:  July 30, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California

23