BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

LESLEY FARBY
Assistant Branch Director
Federal Programs Branch, Civil Division

MARTIN M. TOMLINSON
Senior Trial Counsel (SC Bar No. 76014)
United States Department of Justice Civil Division
1100 L Street, N.W., Washington, D.C. 20005
Telephone: (202) 353-4556
Email: martin.m.tomlinson@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROE #1; JOHN DOE #1; JOHN DOE #2; JOHN DOE #3; JOHN DOE #4; JOHN DOE #5; SECOND AMENDMENT FOUNDATION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF JUSTICE; FEDERAL BUREAU OF INVESTIGATION; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; MERRICK B. GARLAND, in his official capacity as United States Attorney General; CHRISTOPHER A. WRAY, in his official capacity as Director, Federal Bureau of Investigation; MARVIN RICHARDSON, in his official capacity as Acting Director, Bureau of Alcohol, Tobacco, Firearms and Explosives; ROB BONTA, in his official Capacity as California Attorney General, <br><br> Defendants. | CASE NO. 1:19-CV-270-DAD-BAM <br><br><br> **SUPPLEMENTAL BRIEF OF FEDERAL DEFENDANTS** |

1

Pursuant to this Court's Orders of August 8, 2022, ECF No. 102, and August 23, 2022, ECF No. 104, Federal Defendants respectfully submit this Supplemental Brief addressing the potential impact of *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (U.S. June 23, 2022) on the pending issues before the Court.

## BACKGROUND

The facts of this case have already been set forth extensively, *see* ECF Nos. 64, 81-2, 81-3, 82-2, 83, 83-1, 85-2, 85-3, 85-4, & 85-5. The Federal Defendants therefore do not include a full recitation of facts here.

The six remaining Plaintiffs[1] in this matter are individuals who are currently disqualified from owning, purchasing, or possessing a firearm pursuant to 18 U.S.C. § 922(g)(4). That statutory subsection makes it unlawful for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" to own or possess a firearm. Plaintiffs brought suit challenging the prohibition on the possession of firearms imposed on them by 18 U.S.C. § 922(g)(4). Plaintiffs have four claims against Federal Defendants remaining[2]: (1) a facial Second Amendment challenge, Am. Compl. ¶¶ 48-50, ECF No. 36; (2) an as-applied Second Amendment challenge, *id.* ¶¶ 45-47; (3) a Fifth Amendment challenge, *id.* ¶¶ 51-55; and (4) a challenge under 18 U.S.C. § 925A, *id.* ¶¶ 60-62.

The Parties cross-moved for summary judgment on Plaintiffs' claims, *see* ECF Nos. 76, 81, 82, 83, 90, 91, & 92. On June 23, 2022, the Supreme Court issued its decision in *Bruen*. On August 8, 2022, this Court ordered the Parties to provide supplemental briefing addressing what impact, if any, *Bruen* may have on the pending cross-motions for summary judgment. ECF No. 102.

## ARGUMENT

While the Supreme Court's decision in *Bruen* may change the framework this

---

[1] This matter was originally brought by eight Plaintiffs, but two were voluntarily dismissed from the case. *See* ECF Nos. 59 & 77.

[2] Plaintiffs alleged a Tenth Amendment claim, but that claim was later dismissed.

Court uses in analyzing Plaintiffs' Second Amendment challenges,[3] it does not change the result, and this Court should reject Plaintiffs' claims and uphold the constitutionality of 18 U.S.C. § 922(g)(4).

## I. *Bruen* and Its Impact on Ninth Circuit Law

In *Bruen*, the Supreme Court reaffirmed that the Second Amendment "protect[s] the right[s] of ordinary, law-abiding citizen[s]" to possess firearms. 142 S. Ct. at 2122; *see also District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (defining the right to bear arms as belonging to "law-abiding, responsible citizens"). The claim at issue in the case involved a New York state permitting process that required individuals desiring to legally carry handguns outside of the home to first obtain a permit from state authorities, who were given discretion to deny the application "based on a perceived lack of need or suitability." *Bruen*, 142 S. Ct. at 2125. In analyzing the Second Amendment claim, the Court noted that many federal courts of appeals had applied a "two-step test" in analyzing Second Amendment claims. At the first step, "the government may justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood.'" *Id.* at 2126 (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)). If the government was successful in this first step, that generally ended the inquiry, but "if the historical evidence at this step is 'inconclusive or suggests that the regulated activity is *not* categorically unprotected,' the courts generally proceed to step two." *Id.* (quoting *Kanter*, 919 F.3d at 441) (emphasis in original). At the second step, courts of appeals generally applied strict or intermediate scrutiny to analyze whether the regulation in question was constitutional. *Id.* at 2126-27.

However, the Supreme Court held that, "[d]espite the popularity of this two-step approach, it is one step too many." *Id.* at 2127. The Court held that courts analyzing Second Amendment challenges should limit their inquiries to the first step

---

[3] *Bruen* did not address either the Fifth Amendment or 18 U.S.C. § 925A, so those two claims are unaffected by the Supreme Court's decision.

under which the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms;" and courts should not "apply[] means-ends scrutiny in the Second Amendment context." *Id.* The Court then applied that framework, and ultimately held that the discretionary system New York had established for licenses to carry a handgun outside the home was inconsistent with the historical analogues for firearms regulation, and therefore unconstitutional under the Second Amendment. *Id.* at 2156.

In *Mai v. United States*, 952 F.3d 1106 (2020), the Ninth Circuit rejected a challenge to the constitutionality of 18 U.S.C. § 922(g)(4). The Ninth Circuit began its analysis by recognizing the government's "strong argument . . . that § 922(g)(4) does not burden Second Amendment rights." *Id.* at 1114 (quotation omitted). In doing so, the Ninth Circuit noted that *Heller* had explicitly noted that prohibitions on the possession of firearms by the mentally ill were "presumptively lawful." *Id.* (quoting *Heller*, 554 U.S. at 626). The court also noted that "historical evidence supports the view that society did not entrust the mentally ill with the responsibility of bearing arms." *Id.* (citing *Beers v. Att'y Gen.*, 927 F.3d 150, 152 (3d Cir. 2019)). However, the court ultimately held that under intermediate scrutiny, the important governmental interests supporting § 922(g)(4)'s ban on the possession of firearm by those who were involuntarily committed to a mental institution justified the prohibition. *Id.* at 1115-21. Therefore, the court ultimately did not need to reach the issue of whether § 922(g)(4) burdens conduct protected by the Second Amendment. *See id.* at 1115.

The Ninth Circuit has not yet issued any further guidance on the appropriate analysis for Second Amendment challenges after *Bruen*.[4] But *Mai* reached the correct result even if its framework does not survive *Bruen*, and indicated in *dicta* that

---

[4] The Ninth Circuit has vacated and remanded for further proceedings in light of *Bruen*, without analysis or opinion, at least one district court decision in which the district court rejected a Second Amendment challenge because the challenged regulation satisfied intermediate scrutiny, using a similar analytical framework as *Mai*. *See Rupp v. Bonta*, No. 19-56004, 2022 WL 2382319 (9th Cir. June 28, 2022).

§ 922(g)(4) does not burden conduct protected by the Second Amendment. As explained below, § 922(g)(4) is constitutional under *Bruen* because *Bruen* and *Heller* explicitly address mental health related firearm restrictions and it is consistent with the historical tradition of firearms restrictions.

## II.   Section 922(g)(4) is Constitutional Because It Does Not Burden Conduct Protected by the Second Amendment.

Section 922(g)(4) is plainly constitutional under the Court's decision in *Bruen*. As the *Mai* court noted, the government has a "strong argument . . . that § 922(g)(4) does not burden Second Amendment rights." *Mai*, 952 F.3d at 1114 (quotation omitted). The Supreme Court in *Bruen* and *Heller* explicitly noted that regulations on firearm ownership related to mental illness remain presumptively constitutional, and this prohibition is analogous to historical prohibitions on firearms.

### A.   In *Bruen* and *Heller*, the Supreme Court Expressly Noted that Those Decisions Should Not Be Read to Cast Doubt on the Constitutionality of Regulations Like the One at Issue Here.

In *Heller*, the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *Heller*, 554 U.S. at 635. But *Heller* clarified that, "[l]ike most rights, the right to secured by the Second Amendment is not unlimited." *Id.* at 626. *Heller* said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons *and the mentally ill.*" *Id.* at 626 & n.26 (emphasis added).

*Bruen* does not cast doubt on historically rooted firearm restrictions like the one at issue here. The *Bruen* majority did not question the constitutionality of "shall-issue" licensing regimes that "require applicants to undergo a background check or pass a firearms safety course" to ensure that "those bearing arms" are "law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9. In a concurring opinion in *Bruen*, Chief Justice Roberts and Justice Kavanaugh emphasized that, "[p]roperly interpreted,

the Second Amendment allows a 'variety' of gun regulations," and reiterated *Heller*'s statement that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons *and the mentally ill…*") *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626) (emphasis added). The concurring opinion made clear that the decision only impacted "the unusual discretionary licensing regimes, known as the 'may-issue' regimes," and that the decision "does not affect the existing licensing regimes – known as 'shall-issue regimes – that are employed in 43 states." 142 S. Ct. at 2161. "[T]he 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so," and "[t]hose shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, *a mental health records check*, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (emphasis added).

*Bruen* therefore reaffirms the validity of 18 U.S.C. § 922(g)(4). That provision is the only federal statute that regulates firearm possession based upon mental health treatment or determinations. The *Bruen* concurrence's specific reference to the shall-issue regimes that include "mental health records check[s]," some of which involve prohibitions on issuing concealed carry permits to individuals with past adjudication of serious mental illness or commitment in a mental health facility,[5] as consistent with the *Bruen* majority decision makes clear that 18 U.S.C. § 922(g)(4) passes constitutional muster under *Bruen*.

---

[5] *See, e.g.*, Fla. Stat. § 790.06(2)(j) ("The Department . . . shall issue a license if the applicant (j) Has not been committed to a mental institution under chapter 394, or similar laws of any other state."); Idaho Stat. § 18-3302(11)(f) ("A license to carry concealed weapons shall not be issued to any person who . . . (f) Is currently suffering from or has been adjudicated as having suffered from any of the following conditions, based on substantial evidence: (i) Lacking mental capacity . . . (ii) Mentally ill . . ."); La. Stat. 40: 1379.3C.(13) ("To qualify for a concealed handgun permit, a Louisiana resident shall: . . . (13) Not have been adjudicated to be mentally deficient or been committed to a mental institution, unless the resident's right to possess a firearm has been restored.").

**B.    Section 922(g)(4) Is Consistent with Historical Traditions of Firearm Regulation.**

Given that *Heller* and *Bruen* speak specifically to the constitutionality of regulations on ownership by those with a history of serious mental illness or commitment in a mental health facility, this Court should end its inquiry there. However, even if the Supreme Court had not specifically spoken to the question, § 922(g)(4) is constitutional because it "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

*Bruen* was limited to the recognition of "the right of *ordinary*, law-abiding citizen[s]" to possess firearms, 142 S. Ct. at 2122 (emphasis added); *see also Heller*, 554 U.S. at 635 (defining the right to bear arms as belonging to "law-abiding, *responsible* citizens") (emphasis added).    The historical record demonstrates that persons analogous to those within the scope of § 922(g)(4) have long been subject to restrictions on firearms ownership.  The Court in *Heller* recognized as "the predecessor of our Second Amendment," 554 U.S. at 593, the right to arms in the 1689 English Bill of Rights, which protected the right of Protestants to "have Arms for their Defence *suitable to their Conditions*, and as allowed by Law."  *Heller*, 554 U.S. at 593 (quoting 1 W. & M., ch. 2, § 7, in Eng. Stat. at Large 441) (emphasis added).  This protection was understood to be consistent with the disarmament of "any person or persons" judged "dangerous to the Peace of the Kingdome" under the 1662 Militia Act, 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.).  *See* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS 123 (1994).   In the American colonies, disarmament of individuals perceived to be dangerous was also frequent, and such actions were not viewed as inconsistent with the right to bear arms.  *Id.* at 140-41; *see also United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *United States v. Vongxay,* 594 F.3d 1111, 1118 (9th Cir. 2010).  Thus, the "pre-existing right" that the Second Amendment codified was "not unlimited." *Id.* at 592, 595 (emphasis omitted).

The record surrounding adoption of the Constitution confirms this view.  One of the "Second Amendment precursors" identified by *Heller* as "highly influential," 554 U.S. at 603-04 — a proposal offered by the antifederalist faction at the Pennsylvania Convention — provided that "the people have a right to bear arms . . . and no law shall be passed for disarming the people or any of them, unless for crimes committed, *or real danger of public injury from individuals* * * * *," The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Bernard Schwartz, THE BILL OF RIGHTS, A DOCUMENTARY HISTORY 665 (1971) (emphasis added).   Samuel Adams' proposal at the ratifying convention in Massachusetts — identified by *Heller* as a "Second Amendment precursor[]," 554 U.S. at 603-04 — recommended "that the said Constitution be never construed to authorize Congress * * * to prevent the people of the United States *who are peaceable citizens*, from keeping their own arms," Schwartz, THE BILL OF RIGHTS, *supra*, 674-75, 681 (emphasis added).

Historical sources further show that the colonial public did not view persons with a history of mental illness as being among those who could bear arms without "real danger of public injury," *id.* at 665; *see also United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001) (citing historical scholarship demonstrating that colonial American society "excluded infants, idiots, lunatics, and felons" from firearm ownership" and historically "violent criminals, children, and those of unsound mind may be deprived of firearms").   Indeed, persons with a history of mental disturbance were often physically isolated from the community at large through confinement at home or in welfare and penal institutions.  Gerald N. Grob, THE MAD AMONG US: A HISTORY OF THE CARE OF AMERICA'S MENTALLY ILL 5-21, 29, 43 (1994); *see also* Mary Ann Jimenez, CHANGING FACES OF MADNESS: EARLY AMERICAN ATTITUDES AND TREATMENT OF THE INSANE 92, 103-04 (1987).   Thus, any "absence of historical statutory prohibitions on firearm possession [by such persons] may have been the consequence of the fact that in eighteenth-

century America, justices of the peace were authorized to lock up [mentally ill individuals who were dangerous to be permitted to go abroad," *Yancey*, 621 F.3d at 685 (quotation marks omitted), obviating the need for laws formally disarming them. *See* Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) (because "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics,' . . . the lesser step of mere disarmament would likely be permissible as well").

In England and in America from the colonial era through the 19th century, governments regularly disarmed a variety of groups deemed to fall outside the community of ordinary, law-abiding citizens permitted to possess firearms. England disarmed Catholics in the 17th and 18th centuries. *See Heller*, 554 U.S. at 582 (citing 1 W. & M., ch. 15, § 4, in 3 Eng. Stat. at Large 422 (1689); William Blackstone, 4 Commentaries on the Laws of England 55 (1769)). Many American colonies forbade providing Native Americans with firearms.[6] Several American colonies also passed laws disarming those who went about armed "to the terror of the people."[7] "During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance." Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004) (citing Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31; Act of Apr. 1, 1778, ch. LXI, § 5, 1777-1778 Pa. Laws 123, 126). In the nineteenth century, many States also specifically passed laws prohibiting mentally ill persons from owning firearms. *See* 1881 Fla. Laws 87, § 1 (prohibiting

---

[6] *See, e.g.*, 1633 Va. Acts 219; Laws of the Colony of Massachusetts 1633, 37. § 2; 1645 N.Y. Laws 47; 1763 Pa. Laws 319, § 1.

[7] *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52-53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament 17 (1771) (1701 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 statute).

giving "to any person . . . of unsound mind any dangerous weapon"); 1883 Kan. Sess. Laws 159, § 1 (prohibiting giving "dangerous weapons . . . to any person of notoriously unsound mind"); *cf. State v. Hogan*, 63 Ohio St. 202, 208, 219 (1900) (upholding Ohio statute forbidding one who "is found going about begging" from "carrying a firearm," and noting that eight other states had enacted similar statutes).

Section § 922(g)(4) falls squarely within this tradition. It reflects a determination by Congress that persons who satisfy its criteria fall outside the community of "ordinary, law-abiding citizen[s]" who have historically been allowed to possess firearms.. Section 922 was enacted following a multi-year inquiry into violent crime that included "field investigation and public hearings." S. Rep. No. 88-1340, at 1-2 (1964). Local officials testified that they could not prevent persons from misusing firearms "[a]s long as the escaped criminal, or mental patient, or addict can obtain a firearm by crossing a bridge or mailing an order," and thus Federal legislation preventing such persons from possessing firearms was necessary. *Federal Firearms Legislation: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary*, 90th Cong. 92 (1968 ("1968 Hearings") (testimony of New York City Mayor John V. Lindsay). Congress's investigations also revealed a widespread problem of suicide by firearm, showing that firearms "were the agency of death" in over half of all suicides at the time. S. Rep. No. 88-1340, at 3; *see also* 114 Cong. Rec. 21,774 (statement of Rep. Rosenthal); *id.* at 21,811 (statement of Rep. Schwengel). To address these problems, Congress enacted statutory provisions, including § 922(g)(4), to prohibit firearm possession by "individuals who by their previous conduct or mental condition or irresponsibility have shown themselves incapable of handling a dangerous weapon in the midst of an open society," 114 Cong. Rec. 21,809-10 (statement of Rep. Tenzer), such as "persons with a history of mental disturbances," *id.* at 21,784 (statement of Rep. Celler). Congress has also provided that where a § 922(g)(4) disqualification rests on a state's "determination of mental illness, that State should be able to remove that determination" and thereby lift the disqualification by

"establish[ing] procedures that permit a person disqualified on the basis of legal mental illness to prove to the State that he or she no longer poses a danger to society." 153 Cong. Rec. 28,948 (2007) (statement of Rep. McCarthy). Congress has also authorized federal grants to states to, among other measures, set those procedures up so that § 922(g)(4) need not necessarily be a permanent impediment. Pub. L. No. 110-180, § 103(a)(1), 125 Stat. 2567.[8]

Section 922(g)(4) is consistent with a historical tradition of firearms regulation of the mentally ill specifically, and categories of persons who were deemed to be dangerous generally. As *Bruen* specifically noted, in conducting the historical analysis necessary to analyze a Second Amendment challenge, only a "historical *analogue*, not a historical *twin*," is required. 142 S. Ct. at 2133; *see also id.* ("[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."). Rather, courts must "engag[e] in an analogical inquiry" comparing a modern law to historical tradition, analyzing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* As another judge on this court has recognized, "while the Ninth Circuit's Second Amendment jurisprudence has now at least arguably been somewhat cast into doubt" by *Bruen*, given "the historical evidence supporting laws barring the mentally ill from owning firearms, the undersigned strongly believes that § 922(g)(4) would be upheld by the Supreme Court." *Clifton v. U.S. Dep't of Justice*, --- F. Supp. 3d ----, No. 1:21-cv-00089-DAD-EPG, 2022 WL 2791355 at *10 (E.D. Cal. July 15, 2022). This court should likewise recognize that Plaintiffs' Second Amendment claims fail because § 922(g)(4) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127.

---

[8] Federal law also provides that a person barred from owning or possessing a firearm under federal law may apply to the Attorney General for restoration of their rights, 18 U.S.C. § 925(c), but funding for that program has been discontinued.

Dated: September 8, 2022                Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General
                                        Civil Division

                                        LESLEY FARBY
                                        Assistant Branch Director
                                        Federal Programs Branch, Civil Division

                                         /s/ Martin M. Tomlinson
                                        MARTIN M. TOMLINSON
                                        Senior Trial Counsel (SC Bar No. 76014)
                                        Civil Division, Federal Programs Branch
                                        United States Department of Justice
                                        1100 L Street, N.W., Washington, D.C. 20005
                                        Telephone: (202) 353-4556
                                        Email:  martin.m.tomlinson@usdoj.gov
                                        *Counsel for Defendants*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2022, I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.


Dated: September 8, 2022                                    <u>/s/ Martin M. Tomlinson</u>